UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :
                                  :
                                  :
        vs.                       :          07 Cr. 401 (HB)
                                  :
JORDAN DESENBERG,                 :
                                  :
                    Defendant.    :
                                  :
                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PRE-SENTENCE MEMORANDUM ON BEHALF OF DEFENDANT
## JORDAN DESENBERG

Seth C. Farber
Lisa M. Card
DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 259-8000
Facsimile: (212) 259-6333

*Attorneys for Defendant*
*Jordan Desenberg*

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................1

II.   BACKGROUND ...................................................................................2

    A.    Personal History ...........................................................................2

    B.    Offense Conduct and Aftermath ..................................................5

III.  THE SENTENCING GUIDELINES RANGE .....................................9

    A.    The Total Offense Level ................................................................9

    B.    The Criminal History Category of III Over-Represents the Seriousness of Mr. Desenberg's Criminal History and Likelihood That He Will Commit Other Crimes .......................................................................................12

IV.   THE SECTION 3553(a) FACTORS WARRANT A SENTENCE OF 60 MONTHS ......15

    A.    The Nature and Circumstances of the Offense and Mr. Desenberg's History and Characteristics ..............................................................16

    B.    Under These Circumstances, a Sentence Within the Guidelines Range Would Be Excessive .............................................................19

    C.    Mr. Desenberg Respectfully Requests That the Court Impose a Sentence of Five Years Imprisonment ....................................................21

V.    CONCLUSION ..................................................................................24

# TABLE OF AUTHORITIES

Page

**Cases**

*Gall v. United States,*
128 S. Ct. 586 (2007)................................................................................................ 15

*Odiana v. United States,*
499 F. Supp. 2d 196 (N.D.N.Y. 2007).................................................................... 12

*Popal v. Gonzales,*
416 F.3d 249 (3d Cir. 2005)....................................................................................... 13

*United States v. Belflower,*
390 F.3d 560 (8th Cir. 2004) ................................................................................... 11

*United States v. Delmarle,*
99 F.3d 80 (2d Cir. 1996)............................................................................. 10, 11, 20

*United States v. Hall,*
312 F. 3d 1250 (11th Cir. 2002) ............................................................................. 11

*United States v. Hernandez,*
No. 04 CR. 424-20 (RWS), 2005 WL 1423276 (S.D.N.Y. June 13, 2005)............. 12

*United States v. Jones,*
125 F.3d 852, 1997 WL 574851, at *2 (5th Cir. 1997) (unpublished) ................... 20

*United States v. Otero,*
502 F.3d 331 (3d Cir. 2007)..................................................................................... 13

*United States v. Wilkinson,*
C.A. No. 07-12061-MLW, 2008 WL 427295 (D. Mass. Feb. 14, 2008) .......... 22, 23

*United States v. Wolk,*
337 F. 3d 997 (8th Cir. 2003) ................................................................................. 11

**Statutes**

Adam Walsh Act Child Protection and Safety Act, 18 U.S.C. § 4248 ................... 22, 23

18 Pa. Cons. Stat. § 2701(a)............................................................................................ 13

18 U.S.C. § 2252A ................................................................................... 1, 7, 9, 19

18 U.S.C. § 2256(2)(a)................................................................................................... 11

18 U.S.C. § 3553(a) ........................................................................ 1, 2, 15, 19, 20, 21

N.Y. Penal Law § 70.00................................................................................................. 20

N.Y. Penal Law § 235.20(5) ......................................................................................... 11

N.Y. Penal Law § 263.15............................................................................................... 20

**Other Authorities**

Bureau of Prison Program Statement
*Community Corrections Center (CCC) Utilization and Transfer Procedure,*
No. 7310.04 (1998) ......................................................................................................... 21

Bureau of Prison Program Statement
*Psychiatric Services,*
No. P6340.04 (2005) ....................................................................................................... 19

Human Rights Watch,
*No Escape: Male Rape in U.S. Prisons,*
§ 4 (2001) ....................................................................................................................... 22

Mary Sigler,
*Symposium: Sentencing and Punishment: Just Deserts, Prison Rape, and the Pleasing
Fiction of Guideline Sentencing,*
38 Ariz. St. L. J. 561 (2006) ......................................................................................... 22

United States Sentencing Guidelines § 2G2.2 ....................................... 1, 9, 10, 11, 12

United States Sentencing Guidelines § 4A1.1 ................................................................ 12

United States Sentencing Guidelines § 4A1.3 .................................................... 12, 15

I.    **Introduction**

On July 19, 2007, the defendant, Jordan Desenberg, pled guilty to one count of violating Title 18, United States Code, Section 2252A(a)(1), as a result of his emailing 21 images of child pornography to an undercover New York City police officer. This offense carries a mandatory minimum sentence of 60 months' incarceration. In addition, the United States Probation Office has calculated Mr. Desenberg's sentencing range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") to be 135 to 168 months and has recommended a sentence of 135 months' imprisonment, at the bottom of that range.

As explained below, the Probation Office's Guidelines calculation is flawed for two reasons: first, it improperly applies a four-level enhancement, under U.S.S.G. Section 2G2.2(b)(4), for images that display sadistic conduct simply because one of the images depicts anal intercourse with a minor; and, second, it fails to recognize that Mr. Desenberg's criminal history score (which is entirely attributable to a single bar fight) substantially over-represents the seriousness of his criminal history and his likelihood of recidivism and, thus, mistakenly fails to depart downward from Criminal History Category III.

Properly calculated, Mr. Desenberg's Sentencing Guidelines range should be 78-97 months. However, consideration of other factors under Title 18, United States Code, Section 3553(a) – particularly, the nature and circumstances of the offense and the history and characteristics of the defendant – indicate that a lower sentence is warranted. Mr. Desenberg recognizes that his conduct was both wrong and unlawful and he deeply regrets it. Nonetheless, the specifics of that conduct and of Mr. Desenberg's own personal history are relevant to determining an appropriate punishment. Most

significantly, Mr. Desenberg's conduct must be viewed in the context of the sexual abuse that he suffered as a young child, and the particular circumstances of Mr. Desenberg's offense are consistent with the fact that his crime was an isolated incident and a traumatic response to his own childhood abuse. Thus, Mr. Desenberg did not himself create any photographs, did not have any inappropriate contact with children, ceased his conduct several weeks *before* he learned of the involvement of law enforcement, voluntarily surrendered to the Federal Bureau of Investigation ("FBI"), and cooperated in the ongoing FBI investigation. Under these circumstances, the mandatory minimum sentence of 60 months' imprisonment is "sufficient, but not greater than necessary," to effectuate the statutory purposes of sentencing set forth in Section 3553(a). Accordingly, we respectfully request that the Court impose a sentence of 60 months' imprisonment in this case.

## II.    Background

### A.    Personal History

Jordan Desenberg was born Jordan Robert Martinez in York, Pennsylvania on January 18, 1966. *See* Probation Office Presentence Investigation Report, dated January 30, 2008 ("PSR"), ¶ 72. His parents divorced shortly after his birth, and Mr. Desenberg was subsequently adopted by his stepfather, Joel Desenberg, and his surname was changed to reflect the adoption. *Id.* ¶ 73. Mr. Desenberg has three half-siblings: Michael Desenberg, 35; Marcel Martinez, 33; and Nicole Martinez, 25. *Id.* ¶ 72. While Mr. Desenberg was raised by hard-working parents in a middle-class neighborhood, his childhood was destroyed by periods of sexual abuse at the hands of adults. *See* Forensic-Psychiatric Evaluation of Mr. Jordan Desenberg, prepared by Alexander Sasha Bardey, M.D., dated March 17, 2008, attached as Exhibit A to the Declaration of Lisa M. Card in

Support of the Pre-Sentence Memorandum on Behalf of Defendant Jordan Desenberg, dated June 5, 2008 ("Card Decl."), at 2; Adult Sexual Offender Evaluation, Psycho-Sexual Assessment of Mr. Jordan Desenberg, prepared by Kenneth J. Lau, LCSW, dated January 18, 2008, attached as Exhibit B to the Card Decl., at 3.

Around the age of five, Mr. Desenberg was sexually abused several times by the adult son of his mother's second cousin, Greg, to whom the young Mr. Desenberg referred as "uncle."[1]  PSR ¶ 75.  At the time, Mr. Desenberg was living with his grandmother, and she would take him to visit with Greg's family, and the adults would send Mr. Desenberg to play in Greg's room.  Ex. A at 2.  On multiple occasions, Greg forced Mr. Desenberg to perform oral sex on him.  *Id.*  Greg also once held a gun to Mr. Desenberg's head and forced him to perform oral sex on Greg's friend while Greg took pictures.  *Id.*  While the day that this incident happened was the last time Mr. Desenberg was forced to visit Greg, he did not receive any treatment following this period of abuse. *Id.*

Years later, around the age of 13, Mr. Desenberg confided in a priest about the abuse to which he was subjected by Greg.  Ex. A at 3.  That priest, whom Mr. Desenberg knew as Father Joe, was a "floater" priest assigned to Mr. Desenberg's parish, and he was placed in charge of the youth ministry and altar boys.  *Id.*  Having gained Mr. Desenberg's trust, Father Joe began to engage in inappropriate behavior with him.  Father

---

[1] While the PSR suggests that the accounts of certain events provided by Mr. Desenberg to the probation officer and to social worker Kenneth J. Lau were inconsistent, psychiatrist Alexander Sasha Bardey, who also examined Mr. Desenberg, determined that "the differences were minor and are consistent with variations one might expect from telling a similar story to two people, asking different questions about an incident."  *See* Ex. A at 3.  Further, Peggy Cross, Esq., Mr. Desenberg's former attorney, attended the presentence interview and attested that the account Mr. Desenberg gave in the presentence interview is entirely consistent with the facts as set forth in Mr. Lau's report.  *See* Affirmation of Peggy Cross, Esq., dated June 4, 2008, attached as Exhibit C to the Card Decl. ¶ 3.  Although different questions by two different interviewers may have elicited different details about the incident, Ms. Cross found the two discussions of the abuse to be "extremely consistent." *Id.* ¶ 4.

Joe would take Mr. Desenberg for rides in his car, and, once alone with him, would show him pornographic pictures, give him alcohol, and talk about sex and masturbation. *Id.* Once, while alone in the church rectory, Father Joe fondled Mr. Desenberg over his clothes and asked Mr. Desenberg to rub his genitals. *Id.*

The effects of these childhood abuses have been extensive and long-lasting. Before Mr. Desenberg was molested by Father Joe, Mr. Desenberg was an above-average student who attended school regularly and avoided getting into trouble. *Id.* at 4. After he was molested by Father Joe, Mr. Desenberg's academic performance suffered and his behavior worsened. *Id.* Mr. Desenberg began using drugs and alcohol and started sneaking out at night. *Id.* Unable to turn to his family for support, Mr. Desenberg dropped out of school and left his family's home at sixteen, living with various friends and surviving on handouts from his grandmother. *Id.*

After dropping out of high school and leaving his family as a teenager, Mr. Desenberg spent the next several years living a nomadic life, moving from city to city and job to job. After leaving high school, he joined the Job Corps program and received his GED, but left the program soon after. *Id.* Mr. Desenberg then joined a band that traveled around the South and West performing in bars and clubs. *Id.* During this period of time, Mr. Desenberg used drugs and alcohol. *Id.* Mr. Desenberg drank frequently, and smoked marijuana, used cocaine, and experimented with other drugs. *Id.*

By 1993, Mr. Desenberg settled in Florida, and, after a stream of jobs, spent three years working for Acumen Sales, a Daytona Beach company that sold timeshares. Ex. A at 5. In 1997, Mr. Desenberg married Deborah Black, but they

divorced after only three years. *Id.* Once again, Mr. Desenberg was homeless and, after losing his job with Acumen sales, began working various odd jobs. *Id.*

Around this time, Mr. Desenberg sought mental health treatment for the first time. *Id.* He recognized that he had a compulsion to confront individuals that he perceived as bullies or tormentors. *Id.* He was given a dual diagnosis, including a diagnosis of bipolar disorder. *Id.* However, Mr. Desenberg did not receive long-term treatment for his mental illness. *Id.*

Following his diagnosis, Mr. Desenberg continued moving from job to job, including a three-year stint traveling with a company called Midwest Midways. *Id.* Then, in 2005, Mr. Desenberg went back to Pennsylvania. *Id.* One night, after drinking in a bar, Mr. Desenberg was confronted by a man he perceived as a bully, and the two men got into a fight. *Id.* Mr. Desenberg was arrested and held in jail pending trial. *Id.* He pled guilty to a misdemeanor charge of Simple Assault, and was sentenced to time served. *Id.* This one incident resulted in a criminal history category of III.

After Mr. Desenberg was released from custody, he met his fiancée, Carol Ober, in Columbia, Pennsylvania. *Id.* Mr. Desenberg moved in with Ms. Ober, and began working as a telemarketer for Marketing Inter Media in Lancaster, Pennsylvania. *Id.* at 6. While Mr. Desenberg did not want to burden Ms. Ober with the disturbing details of his childhood abuse, he did explain to her that there were reasons that he was not in contact with his family.

**B.    Offense Conduct and Aftermath**

After Mr. Desenberg had been living with Ms. Ober for several months, she purchased a computer, which had America Online ("AOL") installed. Ex. A at 7. For the first time, Mr. Desenberg had access to the internet, and he began to use AOL

chat rooms, *id.*, beginning with one about guitars. Mr. Desenberg, in exploring the AOL service, visited a chat room called "cuties," and was, without solicitation, emailed child pornography. *Id.* Upon viewing the photographs, "intense and intrusive memories of his childhood abuse came flooding back." *Id.* For example, he wondered what happened to the photographs his cousin Greg took of him as a child performing oral sex on Greg's friend.

There were two reasons for Mr. Desenberg's interest in internet child pornography. First, Mr. Desenberg was overwhelmed by the number of screen names he encountered in the chat room, as he could not believe that there were so many people openly interested in child pornography. *Id.* Mr. Desenberg spent hours online in the chat rooms – sometimes for thirty-six to forty-eight hours at a time – in an attempt to determine whether multiple screen names belonged to a single individual, and thus to convince himself that the universe of child pornographers was not as vast as it initially seemed. *Id.*

Second, Mr. Desenberg wanted to determine whether the many individuals who expressed such an interest in children would actually follow through on their fantasies and sexually abuse children, as Greg and Father Joe had done to him. *Id.* It was difficult for Mr. Desenberg to separate the individuals participating in the chat room from those that sexually abused him as a child. Mr. Desenberg attempted to gauge an individual's threat to children through conversations in which Mr. Desenberg would see how depraved an individual would allow a conversation to progress, in order to understand how extensive the problem really was.[2] *Id.* He assumed that there had to be a

---

[2] This curiosity was the impetus for Mr. Desenberg's comment to agents that he "wanted to see how deep the rabbit hole went" and "how far people are into it." *See* PSR ¶ 21.

limit as to what people would discuss or about what they would fantasize. Therefore, in his internet chats, he would allow conversations to degenerate into increasingly disturbing discussions in the hopes that he would cause the other person participating in the chat to end the discussion.

Unbeknownst to him, however, Mr. Desenberg began chatting with an undercover officer of the New York City Police Department posing as a divorced mother of two from the Riverdale section of the Bronx. PSR ¶ 7. The undercover officer had no incentive to stop the conversation at any point; in fact, the incentive was quite the opposite. Therefore, there were two individuals participating in the chats, each with the goal of seeing how far the other person would take the conversation. During these conversations, in February 2007, Mr. Desenberg forwarded to the officer photographs he had received from others, in violation of 18 U.S.C. § 2252A(a)(1). *Id.* ¶ 11.

As a result of his participation in the chat rooms and his obsession with determining the extent of the activity in them, Mr. Desenberg's behavior changed drastically. Ex. B at 6. He became reclusive and anxious, often failing to shower or eat for days at a time. Ex. A at 8. There were times during which he could not leave his bedroom – the room in which the computer was located; at other times, he was found "hiding" in the closet as a result of his panic attacks. Letter to the Court from Carol Ober, attached as Exhibit D to the Card Decl., at 2. Mr. Desenberg recalled one particular instance in which he experienced a panic attack so severe that he was effectively paralyzed on the steps of his church, and had to call Ms. Ober to get him. Ex. A at 8. Unsurprisingly, Mr. Desenberg was unable to perform his job in this condition and had to quit. *Id.*

Mr. Desenberg's radical behavior change was corroborated by the people who interacted with him on a regular basis – his fiancée, Ms. Ober, and her daughter, Jaclyn Miller-Correa – in their letters to this Court. Ms. Ober explained that after getting the computer, the change in Mr. Desenberg's behavior was "like a light switch that turned on." Exhibit D at 1. She explained that he quit his job, stopped going out, and, eventually, would not even leave the bedroom. *Id.* Mr. Desenberg would go whole days without eating and then force himself to eat if Ms. Ober made something especially for him. *Id.* at 2. He quit showering, no longer had sex, and would either sleep excessively, or not at all. *Id.* Ms. Ober also wrote that Mr. Desenberg lost his temper more often and that she would sometimes find him just sitting in the closet. *Id.* Ms. Miller-Correa, Ms. Ober's daughter who lived with Mr. Desenberg and Ms. Ober for several months, also explained that "Jordan went from being a hardworking, well dressed, easy going, out going person to well 'a mess' almost overnight it seemed." Letter to the Court from Jaclyn Miller-Correa, attached as Exhibit E to the Card Decl., at 1. Ms. Miller-Correa further explained that "[h]e stopped eating, showering, or even dressing. He wore the same gym shorts everyday." *Id.* She described that she witnessed first-hand how Mr. Desenberg would hide in his closet and fall asleep. *Id.* at 2. As the mother of young children herself, Ms. Miller-Correa explained that Mr. Desenberg had never done anything with her children, and that he would not even change the children's diapers. *Id.* In addition, Ms. Ober, who frequently cares for her young grandchildren, does not consider him to be a danger to children. Ex. B at 6.

Mr. Desenberg finally came to the conclusion that he would be unable to punish anyone for the abuse he suffered as a child, as Father Joe and Greg were both

deceased.[3] He realized that, by forwarding the photographs he had received from others, he was helping to "memorialize an atrocity," and that he may have encouraged people to commit abuse. Ex. A at 8. Recognizing the harm that could result from his actions, Mr. Desenberg voluntarily ceased his involvement in child pornography, including deleting the images on his computer. *Id.* In fact, in the beginning of April 2007, he emailed AOL to complain about the discussions in the chat room and to alert the service provider that it was facilitating the distribution of child pornography. *Id.* at 12. AOL responded that it was unable to do anything to address the problem. *Id.*

Within two weeks, the FBI arrived at Ms. Ober's home after Mr. Desenberg had left for work. PSR ¶ 19. Ms. Ober called Mr. Desenberg and explained that FBI agents were looking for him, and Mr. Desenberg called one of the agents and waited voluntarily for the agent to come and meet him. Mr. Desenberg waived his *Miranda* rights, and explained to the agents his involvement in the chat rooms. He provided the agents with his screen names and passwords so the agents could assume his online identities, and agreed to maintain the accounts and not access them himself, thus giving the agents complete control to apprehend individuals involved in child pornography. Mr. Desenberg also provided the agents with the information he had regarding the screen names of others who participated in the chat room.

## III. The Sentencing Guidelines Range

### A. The Total Offense Level

Mr. Desenberg pled guilty to one count of violating 18 U.S.C. § 2252A(a)(1). Pursuant to Section 2G2.2(a)(2) of the Sentencing Guidelines, the base offense level for this crime is 22. Four enhancements then apply: (1) two levels because

---

[3] Both committed suicide. Ex. A at 2, 3.

the materials involved a prepubescent minor, pursuant to Section 2G2.2(b)(2); (2) two levels because the offense involved the use of a computer for distribution of the material, pursuant to Section 2G2.2(b)(6); (3) two levels because the offense involved between 10 and 150 images, pursuant to Section 2G2.2(b)(7)(a); and (4) two levels because the offense involved distribution, pursuant to Section 2G2.2(b)(3)(F).  These enhancements raise the total offense level to 30.  Because Mr. Desenberg timely and fully accepted responsibility for his conduct, as recognized in the PSR and the government's *Pimentel* letter, the total offense level should be reduced by three levels pursuant to Sections 3E1.1(a) and 3E1.1(b), resulting in a total offense level of 27.  PSR ¶ 20; Letter from AUSA Parvin Moyne, Esq., to Christopher A. Flood, Esq., dated July 12, 2007 ("*Pimentel* Letter"), at 2.

  The Probation Office, however, recommends an additional four-level enhancement, pursuant to Section 2G2.2(b)(4), on the grounds that the offense purportedly involves material that "portrays sadistic or masochistic conduct or other depictions of violence."[4]  PSR ¶ 31.  The PSR recommends the application of this enhancement based upon a single picture depicting anal sex involving a young child, citing *United States v. Delmarle*, 99 F.3d 80 (2d Cir. 1996).  *See* PSR ¶ 31.  The facts in *Delmarle*, however, were quite different.  As the Second Circuit noted, in the picture at issue in *Delmarle*:

> It is . . . plain that a cylindrical object, of a circumference sufficiently substantial to make it quite likely to cause pain to one so young, is being inserted by an adult hand into the child's anus. At sentencing, Delmarle's attorney stated that the act depicted "would have to be painful."

---

[4] As applied in this case, Mr. Desenberg's Guidelines range with a total offense level of 27 and a criminal history category of II is 78-97 months.  If the total offense level were 31, the range would increase dramatically, to 121-151 months.

*Delmarle*, 99 F.3d at 83. In this case, however, the picture does not depict the forcible insertion of a foreign object into a child's anus, but rather simply depicts anal sex, *i.e.*, "an adult male's erect penis penetrating a prepubescent female's anus." PSR ¶ 22.

However, anal sex, even involving a child, does not in and of itself warrant an enhancement under Section 2G2.2(b)(4) for "sadistic or masochistic conduct." To the contrary, as the Second Circuit noted, *"Webster's Third New International Dictionary*, consulted by the district court in [*Delmarle*], defines sadism to include 'the infliction of pain upon a love object as a means of obtaining sexual release,' 'delight in physical or mental cruelty,' and the use of 'excessive cruelty.'" *Delmarle*, 99 F.3d at 83; *see, e.g., United States v. Wolk*, 337 F.3d 997, 1007-1008 (8th Cir. 2003) (finding pictures involving masks, collars, and handcuffs sadistic because "they express a delight in mental and physical cruelty"); N.Y. PENAL LAW § 235.20(5) (defining "sado-masochistic abuse" as "flagellation or torture by or upon a person clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed").[5]

Even the statute to which Mr. Desenberg pled guilty acknowledges the distinction between anal intercourse and sadistic behavior. *See* 18 U.S.C. § 2256(2)(a) (differentiating between anal sex and sadistic or masochistic conduct in defining sexually explicit conduct). Moreover, to the extent that anal sex with a young child is worse than other anal sex, that distinction has already been taken into account through the

---

[5] We recognize that some Courts of Appeals have ruled that images of an adult male engaging in anal penetration of a prepubescent minor are necessarily sadistic. *See, e.g., United States v. Hall*, 312 F.3d 1250 (11th Cir. 2002); *United States v. Belflower*, 390 F.3d 560 (8th Cir. 2004). However, those decisions – which are not binding on this Court – fail to appreciate that "sadism" requires the infliction of pain for the purpose of enhancing sexual gratification, and a depiction of anal intercourse, without aggravating factors or additional information, does not satisfy that standard.

application of the two-level enhancement pursuant to Section 2G2.2(b)(2) because the materials involved a prepubescent minor. *See Odiana v. United States*, 499 F. Supp. 2d 196, 202 (N.D.N.Y. 2007) (stating that "[t]he Second Circuit has said that double counting is unconstitutional when the same conduct that is the basis for certain penalties elsewhere in the Sentencing Guidelines is also used as the basis for separate enhancement, unless it was clearly the prerogative of Congress and the Sentencing Commission to allow such action"). Therefore, the four-level enhancement should not apply, and the total offense level should be 27.

### B. The Criminal History Category of III Over-Represents the Seriousness of Mr. Desenberg's Criminal History and Likelihood That He Will Commit Other Crimes

Pursuant to Section 4A1.1, Mr. Desenberg received six criminal history points, all resulting from one fight outside of a bar.[6] These six points place him in Criminal History Category III.

However, the Sentencing Guidelines specifically provide for a downward departure where a defendant's "criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b); *see also United States v. Hernandez*, No. 04 CR. 424-20(RWS), 2005 WL 1423276, *23 (S.D.N.Y. June 13, 2005) (imposing mandatory minimum sentence based, in part, on finding that the criminal history points assigned to defendant's prior convictions "over-represent[] the severity and magnitude of [the defendant's] past criminal conduct"). Such a departure is warranted here. Each of

---

[6] Pursuant to Section 4A1.1(a), Mr. Desenberg received three points because the sentence imposed on April 17, 2006 was one year minus one day to two years minus one day. This was actually a sentence to time served, because Mr. Desenberg was released to parole services on the day of his sentencing. *See* PSR ¶ 61. Pursuant to Section 4A1.1(d), he received two additional points for committing the current offense while on probation, and pursuant to Section 4A1.1(d), he received one more point for committing the crime within two years of his release date.

the six criminal history points is a result of a single conviction for Simple Assault, 18 Pa. Cons. Stat. § 2701(a), arising out of a bar fight. While such behavior is inappropriate, for a bar fight to result in a criminal history category of III is excessive, and over-represents the seriousness of the offense. Indeed, Simple Assault under Pennsylvania law is a misdemeanor, and is not considered a "crime of violence." *See Popal v. Gonzales*, 416 F.3d 249, 254-55 (3d Cir. 2005) (holding that simple assault under Pennsylvania law is not a crime of violence pursuant to 18 U.S.C. § 16(a)); *see also United States v. Otero*, 502 F.3d 331, 335-36 (3d Cir. 2007) (holding that simple assault under Pennsylvania law is not a crime of violence pursuant to U.S.S.G. § 2L1.2, citing *Popal*). Although Mr. Desenberg does have other prior convictions, they are all from almost ten years ago or more and most are for minor offenses, such as disorderly conduct. *Pimentel* Letter at 2-4. None of these offenses suggest that Mr. Desenberg is likely to commit another crime – and certainly not another crime of this nature – when he has finished serving his lengthy sentence in this case.

The reports of social worker Kenneth Lau and psychiatrist Alexander Sasha Bardey confirm that Mr. Desenberg poses little risk of committing future crimes. Mr. Lau administered two risk assessment tests, both of which are "clinically valid and reliable," and determined that Mr. Desenberg was in the "low risk category" for sexual recidivism. *See* Ex. B at 6. Mr. Lau also noted that his assessment did not indicate any history of sexual attraction towards children, and that there was no reported history of his having even been accused of sexually inappropriate behavior towards children. *Id.* Similarly, Dr. Bardey concluded that "Mr. Desenberg does not meet criteria for a diagnosis of pedophilia at this time," and "his offense conduct does not appear motivated

by a need for sexual gratification with underage individuals." Ex. A at 13-14. Dr.
Bardey also concluded that the offense conduct is not "a step along a continuum that
might end with further or direct sexual victimization of children." *Id.* at 14. Moreover,
Dr. Bardey determined that it does not appear that Mr. Desenberg "harbors an ongoing
interest or fascination with pedophilic materials or that he has any interest or desire to
continue to involved [*sic*] himself in any pedophilic activities either in a virtual or in a
real life manner." *Id.* Finally, Dr. Bardey concluded:

> In the end, Mr. Desenberg does not appear to be a danger to
> himself or others. There was no evidence to suggest that Mr.
> Desenberg had a history of attraction towards children, there is no
> history of prior arrests for such offense, and there was no
> indication in the risk assessment tools administered by Mr. Lau
> that would suggest that Mr. Desenberg is at risk of dangerousness
> or a risk of sexual recidivism.

*Id.*

Mr. Desenberg's post-offense conduct, however, provides even more
compelling evidence of his low risk of recidivism. In stark contrast to the usual case, Mr.
Desenberg had ceased engaging in illegal conduct before he learned that he was under
investigation. Ex. A at 8. In particular, before he was even contacted by law
enforcement, Mr. Desenberg had deleted the offending images from his computer, and
even went so far as to contact AOL in an attempt to get that internet service provider to
prevent further distribution of child pornography through its chat rooms. *Id.* at 8, 12.
Post-arrest, Mr. Desenberg's conduct was similar; he voluntarily surrendered to the FBI,
answered all the FBI's questions, and even assisted the agents in assuming his online
identity so that they could continue their investigation.

In sum, because the criminal history category of III overstates the
seriousness of Mr. Desenberg's criminal history and the likelihood that he will commit

similar offenses, accordingly, this Court should depart downward to Criminal History Category II, pursuant to Section 4A1.3(b).

## IV.    The Section 3553(a) Factors Warrant a Sentence of 60 Months

Calculation of the Sentencing Guidelines range is only the first step in determining an appropriate sentencing. *See Gall v. United States*, 128 S. Ct. 586, 596 (2007). Sentencing courts are required to consider all of the factors set forth in 18 U.S.C. § 3553(a), and determine an appropriate sentence for each individual defendant. *Id.* In doing so, the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 [of Section 3553(a)]." 18 U.S.C. § 3553(a). Pursuant to Section 3553(a), a Court must consider, in relevant part:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed --
- (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
- (B)    to afford adequate deterrence to criminal conduct;
- (C)    to protect the public from further crimes of the defendant; and
- (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established for--
- (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; . . . .

18 U.S.C. § 3553(a).

A.    **The Nature and Circumstances of the Offense and Mr. Desenberg's History and Characteristics**

Both the nature and circumstances of the offense and the history and characteristics of the defendant counsel in favor of imposing the mandatory minimum sentence. Mr. Desenberg's involvement in the world of child pornography was limited both in duration and scope, and, most importantly (and in contrast to most child pornography cases), Mr. Desenberg ceased his involvement on his own volition before he even knew of the government's investigation. Ex. A at 8. Mr. Desenberg did not create any images himself or have any inappropriate contact with children. He never traveled to New York to meet the woman with whom he thought he was communicating, or her children. Mr. Desenberg only participated in these chat rooms for a matter of months, and then voluntarily ended his involvement about one and one-half months prior to his arrest, including deleting all of the images. *Id.* As Dr. Bardey described:

> Mr. Desenberg's interest in these images was limited in time to a brief, but intense, bout, in early 2007. There is no pattern of escalating interest or involvement with these materials, nor is there evidence that his sexual interests had ever been anything but for adult heterosexual interactions. The sudden, intense, obsessive, and all-absorbing nature of the offense conduct is consistent with Mr. Desenberg's explanation of his involvement, rather than the typical pattern evidenced by a pedophile of his age.

*Id.* at 13. This analysis is consistent with Mr. Desenberg's own account of his reasons for his involvement: to determine the number of individuals involved in internet child pornography, which individuals might commit child sexual abuse, and how far individuals would sink in conversations before terminating them. *See* Ex. A at 7-8.

In addition, Mr. Desenberg continued his attempts to stop child pornography by reporting its existence to AOL and assisting the investigators by

providing them his user names and passwords so they could assume his identity online to continue their investigation into internet child pornography.

As described in detail in Section II.A, *supra*, Mr. Desenberg was a victim of childhood sexual abuse from several individuals, beginning around age five and continuing to his teenage years, and Mr. Desenberg never received proper mental health treatment in response to this abuse. The effects of Mr. Desenberg's childhood sexual abuse manifested themselves in the current offense. In Dr. Bardey's medical opinion, "Mr. Desenberg currently manifests signs and symptoms of depressive and anxiety disorders related to the sexual abuse he was a victim of." Ex. A at 14. The Post Traumatic Stress and Adjustment Disorder with Anxiety and Depression with which Mr. Desenberg was diagnosed by Dr. Bardey caused Mr. Desenberg "to suffer from disabling symptoms that impacted negatively on his thinking and judgment at the time of the offense." *Id.* Dr. Bardey further explained, "[o]verwhelmed with intrusive recollections of the abuse he had endured, [Mr. Desenberg] became depressed, panicky, and obsessed with the images and their relationship to his own experience." *Id.* "During this period, he was not functioning; he withdrew socially, and lost his job." *Id.* This radical shift in behavior resulting from Mr. Desenberg's offense conduct was corroborated by both his fiancée and her daughter, as described in Section II.B, *supra*.

Also, as noted above, Mr. Desenberg voluntarily ended this involvement and attempted to work with AOL and the FBI to further reduce the problem of child pornography. Ex. A at 8. As confirmed by Dr. Bardey, "[w]hen he regained clarity of thought, Mr. Desenberg was able to cease the behaviors on his own and was able to recognize the errors in judgment he had made." *Id.* at 14.

Furthermore, in Dr. Bardey's medical opinion, it does not appear that Mr. Desenberg "harbors an ongoing interest or fascination with pedophilic materials or that he has any interest or desire to continue to involve[] himself in any pedophilic activities either in a virtual or a real life manner. The instant offense was specifically the product of unresolved issues that Mr. Desenberg had harbored quietly for years until they came to the surface." *Id.*

Mr. Lau also stated in his report that there are indications that Mr. Desenberg suffers from Post Traumatic Stress as well as depression. Ex. B at 7. While Mr. Lau noted that Mr. Desenberg developed a "curiosity towards child pornography," Mr. Lau never described it as a sexual curiosity. *Id.* Mr. Desenberg explained his curiosity – that he wanted to know how many individuals were involved in child pornography and just how far such people would go. Ex. A at 9. Moreover, as Dr. Bardey asserts, this curiosity was fueled by his history of childhood abuse and the recollections of such abuse, and the resulting depression, panic, and obsession. *Id.* at 14. As Mr. Lau observed, "Mr. Desenberg clearly is disturbed about the incident with the older boys and the priest." Ex. B at 7.

The evaluations and assessments performed by Dr. Bardey and Mr. Lau confirm that Mr. Desenberg does not warrant the astronomical sentence recommended in the PSR (or even calculated by the defense under the Guidelines). Ex. A at 14; Ex. B at 7-8. It is Dr. Bardey's opinion, "with a reasonable degree of medical certainty that Mr. Desenberg does not meet criteria for a diagnosis of pedophilia." Ex. A at 13. He noted that Mr. Desenberg's conduct "does not appear to be motivated by a need for sexual gratification with underage individuals" and it does not "represent a step along a

continuum that might end with further or direct sexual victimization of children." *Id.* at 14. Indeed, as Ms. Ober reported to Mr. Lau, "when she speaks to him on the phone he sounds like the original man she met." Ex. B at 6.

For these reasons, Mr. Desenberg is not a typical defendant in a prosecution pursuant to 18 U.S.C. § 2252A. Mr. Desenberg's personal history and characteristics, as well as the nature of his offense, take him out of the "heartland" of typical offenders under that statute. In particular, Dr. Bardey's conclusions that Mr. Desenberg did "not appear to be motivated by a need for sexual gratification with underage individuals," did not appear "that he has any interest or desire to continue to involved [sic] himself in any pedophilic activities," and did not meet the diagnosis of pedophilia all support the conclusion that a sentence outside of the Guidelines range would not result in an unwarranted sentencing disparity. *See* 18 U.S.C. § 3553(a); Ex. A at 14.[7]

### B.    Under These Circumstances, a Sentence Within the Guidelines Range Would Be Excessive

In light of the Section 3553(a) factors discussed above, a sentencing range of 78 to 97 months would still be higher than necessary to implement the goals of Section

---

[7] Imposing a non-Guidelines sentence will also aid Mr. Desenberg in getting the necessary and most appropriate treatment for his particular mental disorders that he may not be able to obtain in prison. As Dr. Bardey reported, "Mr. Desenberg would benefit from a course of rigorous psychotherapy, with the possible addition of psychotropic medications, to explore and treat the underlying conflicts which have so negatively impacted on his life, such a[s] depression, anxiety, anger, the offense conduct, and substance abuse." Ex. A at 14. In fact, according to the Bureau of Prison's ("BOP") 2005 Program Statement on Psychiatic Services, the services available to inmates are based upon "the institution's mission as well as the staff and community psychiatric resources available at the institution." Bureau of Prison 2005 Program Statement on Psychiatric Services, No. P6340.04, at 6 (2005), *available at* http://www.bop.gov/DataSource/execute/dsPolicyLoc. Thus, because there is no indication that Mr. Desenberg will receive the "rigorous" treatment he needs from the BOP, a non-Guidelines sentence (with an earlier release date) will expedite his ability to receive needed treatment. *See* 18 U.S.C. § 3553(a)(2)(D).

3553(a).[8]  The effects of the numerous enhancements imposed upon Mr. Desenberg far

exceed any incremental harm caused by the particular aspects of his offense conduct.  For

example, Mr. Desenberg received a two-level enhancement because his offense involved

more than 10 but fewer than 150 pictures.  According to the PSR, Mr. Desenberg's

offense involved only 21 pictures.  PSR ¶ 22.  A two-level enhancement, potentially

increasing Mr. Desenberg's sentence by almost two years because of ten pictures, is

unduly harsh.

In addition, the two-level enhancement because Mr. Desenberg's offense

involved distribution also results in excessive punishment.  Mr. Desenberg's conviction

was for distribution, and therefore distribution was already taken into account for in his

base offense level.  Given Mr. Desenberg's limited distribution of the images, this

enhancement unfairly results in incremental punishment.

Moreover, even if the Court determines that the four-level enhancement –

which, at Criminal History Category III, increases Mr. Desenberg's Guidelines range

from 87-108 months to 135-168 months – technically applies, its application in this case

would be unduly severe.[9]  According to the PSR, this enhancement stems from only one

photograph sent by Mr. Desenberg.  PSR ¶ 31.  Even if this Court were to conclude that

this single image was technically "sadistic" under the Guidelines, the simple anal

intercourse depicted is undeniably less disturbing than the forced insertion of a foreign

object, as described in *Delmarle*, or the intentional infliction of pain depicted in a typical

sadism enhancement case.  *See, e.g., United States v. Jones*, 125 F.3d 852, 1997 WL

---

[8] The excessiveness would be even more pronounced if the Court were to adopt the Probation Office's recommended range of 135 to 168 months.  PSR . ¶ 118.

[9] In fact, had this crime been prosecuted by the State of New York, rather than handed to the FBI by the New York City Police Department for federal prosecution, the *maximum* sentence Mr. Desenberg could have received would have been seven years.  N.Y. PENAL LAW §§ 70.00, 263.15 (2008).

574851, at *2 (5th Cir. Aug. 21, 1997) (unpublished) (finding a picture depicting a "nude, blindfolded female, with bound legs, hanging from the ceiling with hand-cuffs" sadistic or masochistic under the U.S.S.G.). Under these circumstances, an increase in Mr. Desenberg's sentence on the basis of this single image – which he did not create or profit from – would serve no rational purpose under Section 3553(a).

Finally, and most significantly, as noted in Section III.B and Section IV.A *supra*, the fact that Mr. Desenberg ceased his involvement in child pornography on his own and the analyses by both Dr. Bardey and Mr. Lau indicate that Mr. Desenberg presents a low risk of recidivism. For all these reasons, a sentence of 60 months' imprisonment is sufficient "to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2).

### C.    Mr. Desenberg Respectfully Requests That the Court Impose a Sentence of Five Years Imprisonment

Based upon consideration of the Section 3553(a) factors set forth above, Mr. Desenberg respectfully requests that this Court sentence him to five years of imprisonment. A penalty of five years of incarceration is a severe punishment that will reflect the seriousness of Mr. Desenberg's offense and provide both general and specific deterrence.[10] Moreover, although such a sentence is significant punishment for any offender, its onerousness is magnified for defendants such as Mr. Desenberg.

---

[10] Furthermore, in contrast to most other offenders who are eligible to spend up to 10% of their sentence in a halfway house, Mr. Desenberg will likely serve his entire sentence in prison. Because Mr. Desenberg will likely be assigned a "sex offender" Public Safety Factor, he will be ineligible for halfway house placement. *See* Bureau of Prison 1998 Program Statement on Community Corrections Center (CCC) Utilization and Transfer Procedure, No. 7310.04, at 3-4, 11-12 (1998), *available at* http://www.bop.gov/DataSource/execute/dsPolicyLoc.

As a man convicted of an offense involving child pornography, Mr. Desenberg is likely to be in danger from other prisoners throughout his incarceration. *See* Mary Sigler, *Symposium: Sentencing and Punishment: Just Deserts, Prison Rape, and the Pleasing Fiction of Guideline Sentencing*, 38 Ariz. St. L.J. 561, 567 (2006) ("Certain categories of offenders are known to be more vulnerable, including sex offenders, especially those who have victimized children."); Human Rights Watch, *No Escape: Male Rape in U.S. Prisons*, § 4 (2001), *available at* http://www.hrw.org/reports/2001/prison/report.html ("it is apparent that inmates convicted of sex crimes against minors, if their crimes become known to other inmates, are much more apt to be targeted for sexual abuse in prison"). Mr. Desenberg is deeply concerned with and frightened by the prospect of being sexually abused in prison, which has led to similar thoughts about the sexual abuse he suffered as a child. Ex. A at 11. His fear has also manifested itself in other ways, including a loss of appetite and an inability to sleep. *See id.* Thus, given Mr. Desenberg's history of sexual abuse and the heightened risk that he will be further victimized while incarcerated, a 60 month sentence served by him will be more difficult than the same sentence served by almost any other offender, including offenders involved in crimes against children.

In addition, Mr. Desenberg faces another daily uncertainty. Pursuant to the Adam Walsh Act, Title 18, United States Code, Section 4248, after Mr. Desenberg finishes serving his sentence, the Director of the BOP or his designee may determine that Mr. Desenberg is a "sexually dangerous person" and refuse to release him. Far from being an irrational fear, the very real effects of the Adam Walsh Act have been recognized by federal courts. In *United States v. Wilkinson*, C.A. No. 07-12061-MLW,

2008 WL 427295 (D. Mass. Feb. 14, 2008), for example, respondent Wilkinson was certified as a sexually dangerous person one day prior to his scheduled release from prison, and "[t]herefore, Wilkinson's release from custody was automatically stayed until proceedings to determine whether Wilkinson is sexually dangerous are concluded by this court." *Wilkinson*, 2008 WL 427295, at *2. In that case, an opinion on the *probable cause* hearing was not issued until over one year after respondent was to be released, and it was only then that the examiners were finally appointed by the court. *Id.* at *13. As the court explained, in every case in that district under the Adam Walsh Act, the certification was filed by the BOP just before the end of the respondent's sentence, and "the BOP may intend to continue to file certifications just before sentences are due to end." *Id.* at 1. While the district court in *Wilkinson* noted that proceedings pursuant to the Adam Walsh Act would take at least several months, *id.* at 2, *Wilkinson* evidences that it could potentially take years to determine whether a person is sexually dangerous. Thus, Mr. Desenberg faces the uncertainty of the potential months or years for a court to determine whether he is a sexually dangerous person under the Adam Walsh Act. Upon the conclusion of those proceedings, Mr. Desenberg may be held against his will far beyond the sentence imposed by this Court, and perhaps indefinitely. *See id.* at 3 (stating that the Adam Walsh Act "establishes standards and procedures for determining whether federal prisoners are sexually dangerous and, therefore, should remain in custody, potentially for life").

## V.    Conclusion

Mr. Desenberg has accepted responsibility for his conduct in this case, and fully recognizes that he must be punished for it. For all of the reasons set forth above, we respectfully submit that the appropriate punishment is a five-year term of imprisonment.

Dated: New York, New York
      June 5, 2008

Respectfully submitted,

Seth C. Farber
Lisa M. Card
DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 259-8000
Facsimile:  (212) 259-6333

*Attorneys for Defendant*
*Jordan Desenberg*